AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20) ☐ Original ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| United States of America<br><br>v.<br><br>Luis Antonio Victoria Dominguez,<br><br>Defendant | Case No.<br><br>2:21-mj-03043 -duty |

FILED
CLERK, U.S. DISTRICT COURT
6/27/2021
CENTRAL DISTRICT OF CALIFORNIA
BY: ___DL___ DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of June 25, 2021 in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 49 U.S.C. § 46504 | Interference with Flight Crew Members and Attendants |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ William Richau
Complainant's signature

William Richau, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: June 27, 2021 at 1:34 p.m.

R. A. Oliver
*Judge's signature*

City and state: Los Angeles, California

Hon. Rozella A. Oliver, U.S. Magistrate Judge
*Printed name and title*

AUSA: Solomon Kim x. 2450

**AFFIDAVIT**

I, William Richau, being duly sworn, declare and state as follows:

**PURPOSE OF AFFIDAVIT**

1. This affidavit is made in support of a complaint against LUIS ARMANDO VICTORIA DOMINGUEZ ("VICTORIA DOMINGUEZ") for violation of Title 49, United States Code, Section 46504 (Interference with Flight Crew Members and Attendants).

2. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrant and does not purport to set forth all of my knowledge of the investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

**BACKGROUND OF AFFIANT**

3. I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed since 2006. Since 2016, I have been assigned to the Los Angeles International Airport ("LAX") Office of the FBI, where I investigate violations of federal law which occur within the airport environment and on board aircraft. My experience includes interviewing victims, subjects, and witnesses, gathering documents, analyzing video footage, assisting with the execution of search warrants, assisting with the execution of

1

arrest warrants, conducting surveillance, and serving grand jury subpoenas. Before this assignment, I received training in complex investigations while attending the FBI Special Agent Academy in Quantico, Virginia. This training included, among other things, instruction regarding search and seizure law.

4. Through my training and experience with the FBI, I have become familiar with Title 49, United States Code, Section 46501, which establishes the Special Aircraft Jurisdiction of the United States and, under Sections 46501(1)(A) and 46501(2)(C), gives the federal government jurisdiction in all criminal matters occurring on any civil aircraft that is "in flight" in the United States (i.e., from the moment all external doors are closed through the moment when one external door is opened to allow passengers to leave the aircraft).

## SUMMARY OF PROBABLE CAUSE

5. Title 49, United States Code, Section 46504 states, in pertinent part, "[a]n individual on an aircraft in the special aircraft jurisdiction of the United States who, by assaulting or intimidating a flight crew member or flight attendant of the aircraft, interferes with the performance of the duties of the member or attendant or lessens the ability of the member or attendant to perform those duties, or attempts or conspires to do such an act, shall be fined under title 18, imprisoned for not more than 20 years, or both."

6. On the evening of June 25, 2021, VICTORIA DOMINGUEZ boarded United Airlines flight UA 5365, operated by SkyWest Airlines, which was scheduled to depart from Los Angeles,

California, and land in Salt Lake City, Utah.  After the aircraft pushed back from Gate 82 and was taxiing toward the runway, VICTORIA DOMINGUEZ approached the cockpit and pounded on the door several times.  Flight attendant L.B. interceded with the intention of preventing VICTORIA DOMINGUEZ from breaching the cockpit.  VICTORIA DOMINGUEZ then turned to the right exit door and opened it, partially deploying the slide.  He pulled free from passenger A.G., who had come to assist L.B., and jumped out of the aircraft onto the tarmac.  After the flight returned to Gate 82, mechanics were forced to fully deploy the slide to eliminate any further safety hazards.  VICTORIA DOMINGUEZ was apprehended by the Los Angeles Airport Police Department ("LAXPD") and transported to the emergency room with a fractured right leg.

## STATEMENT OF PROBABLE CAUSE

7.    Based on my review of law enforcement reports, my discussions with law enforcement agents and officers involved in the investigation, and my own observations and knowledge of the investigation, I am aware of the following:

**A.    Witness Interviews**

8.    On June 25, 2021, I interviewed witness K.C., the passenger in seat 10A, seated next to VICTORIA DOMINGUEZ in seat 10B, on flight UA5365, outbound from Los Angeles, California to Salt Lake City, Utah, on June 25, 2021, who stated, among other things, the following:

   a.    When VICTORIA DOMINGUEZ sat down next to K.C., he "looked sketchy" because he kept looking around and toward the

back of the aircraft. VICTORIA DOMINGUEZ asked K.C. about her boarding pass, but K.C. felt uncomfortable and tried to ignore him.

      b. As the aircraft was pushing back, VICTORIA DOMINGUEZ got fidgety and K.C. observed what she described as a "big twitch." VICTORIA DOMINGUEZ asked her where she was going, and she replied that it was not his business. VICTORIA DOMINGUEZ then whispered that he needed to get out, was going to jump out, and said, "I'm serious."

      c. VICTORIA DOMINGUEZ unbuckled his seat belt and sprinted to the front of the aircraft. K.C. saw VICTORIA DOMINGUEZ try to fight off flight attendant L.B. At least five male passengers stood up to assist L.B.

      d. K.C. heard the aircraft door open and knew that VICTORIA DOMINGUEZ had jumped out because she heard the passengers on the right side of the aircraft say that he was running.

9. On June 25, 2021, several FBI agents and I interviewed witness L.B., a SkyWest Airlines flight attendant on UA 5365, who stated, among other things, the following:

      a. L.B. was one of two flight attendants on UA 5365 and was assigned to service the front half of the aircraft. The second flight attendant was assigned to the back half of the aircraft.

      b. The aircraft pushed back from Gate 82 and began taxiing after all doors had been closed. L.B. was seated and secured in the jump seat located in the front of the aircraft

4

near the main boarding door on the left side of the aircraft and the cockpit. While the plane was taxiing to the runaway, L.B. noticed VICTORIA DOMINGUEZ approaching the front of the aircraft from seat 10B. VICTORIA DOMINGUEZ was mumbling incoherent phrases in what sounded to L.B. like broken Spanish. Initially, L.B. believed that VICTORIA DOMINGUEZ was coming to the front of the aircraft to use the bathroom, and she asked him to return to his seat.

   c. However, VICTORIA DOMINGUEZ continued past L.B. and began banging on the cockpit door and manipulating the locked doorknob, while saying something about getting off the aircraft. L.B.'s main concern was defending the cockpit. She "prayed that they [the flight crew] would not answer the door."

   d. The flight crew did not open the cockpit door. When VICTORIA DOMINGUEZ was unsuccessful at gaining entry to the cockpit, he pushed past L.B. and proceeded to the emergency exit door on the right side of the aircraft. He managed to push the door approximately three-quarters of the way open, but the emergency slide did not deploy fully.

   e. Passenger A.G., a nearby passenger who had been seated in seat 3C, rushed to the door and grabbed VICTORIA DOMINGUEZ's arm in an attempt to keep him in the aircraft. Moments later, VICTORIA DOMINGUEZ maneuvered away from A.G. and fell out of the open emergency exit door onto the tarmac. Once VICTORIA DOMINGEZ landed on the tarmac, he began crawling away from the aircraft. His right leg appeared broken.

10. On June 25, 2021, several FBI agents interviewed witness A.G., the passenger in seat 3C, who stated, among other things, the following:

    a. A.G. was sitting in seat 3C with his headphones on when he noticed VICTORIA DOMINGUEZ walking briskly to the front of the aircraft. Flight attendant L.B. initially instructed VICTORIA DOMINGUEZ to sit down, but he did not acknowledge her instruction. He passed L.B. and proceeded to pound four or five times on the cockpit door with his fist. L.B. asked for help and attempted to pull VICTORIA DOMINGUEZ back from the cockpit door. VICTORIA DOMINGUEZ pushed L.B. out of the way with his forearm as he turned toward the forward right emergency exit door (located to the right of the cockpit door near the forward galley).

    b. A.G. quickly got out of his seat and approached VICTORIA DOMINGUEZ at the emergency exit door. By the time A.G. arrived at the door, the door was open and the emergency slide was partially deployed.

    c. A.G. grabbed VICTORIA DOMINGUEZ by the shirt collar and pulled him back in an attempt to keep him in the aircraft, but VICTORIA DOMINGUEZ attempted to free himself. Meanwhile, L.B. was on the phone with the flight deck and said, "you need to stop the plane." The aircraft then stopped.

    d. A.G. held on to VICTORIA DOMINGUEZ for a few seconds before VICTORIA DOMINGUEZ twisted himself free. VICTORIA DOMINGUEZ then fell out of the emergency exit door and onto the tarmac without coming into contact with the partially

deployed emergency slide. VICTORIA DOMINGUEZ then began crawling away from the aircraft.

    11. On June 25, 2021, several FBI agents interviewed witness J.S., the captain of UA 5365, who stated, among other things, the following:

        a. After leaving the gate, the aircraft was on the tarmac and moving slowly toward the runway for departure. The plane was approximately ¾ mile from the runway and number two in line for departure when J.S. heard an extremely loud banging on the cockpit door and the forward flight attendant L.B. screaming from outside the door. J.S. also heard some scuffling and weight shifting around heavily.

        b. This was the first time J.S. experienced anyone banging on the cockpit door. He was initially confused because there is a "knock system" that the flight attendants use to communicate with the flight deck to open the door in the event the interphone does not work. That was not the case in this situation, so there was no reason for the flight attendants to knock on the door.

        c. J.S. immediately assumed that someone was trying to breach the cockpit. Within seconds of hearing the screaming and scuffle from the outside, J.S. received an interphone call from L.B. saying, "somebody subdued him." J.S. thought things were under control, but within seconds after the call, he saw a warning light go off on the center of the control panel that indicated that an aircraft door was open. He also heard a

hissing noise indicating a door opening. Then he and first officer pilot T.W. realized that someone got off the plane.

    d.  T.W. opened a window to look outside for an open aircraft door and observed the right galley door partially open with the emergency slide partially deployed. Because the slide is pressurized, J.S. knew that it would be very dangerous if it suddenly deployed fully from that position without any clearance. The slide fully deploying while the plane was moving or with the engine on was also a threat because the slide could get sucked into the engine. As a result, J.S. and T.W. decided to turn off the right engine. Once the plane returned to the gate, maintenance came, cleared the area, and fully deployed the slide to prevent any further safety hazards.

    e.  J.S. declared this incident as a Level 4 threat, which he described as "huge … the biggest" threat. When J.S. eventually opened the cockpit door, he saw that L.B. was very shaken up. Over an hour after the incident, while the investigation was ongoing, J.S. accompanied L.B. off the plane as she was still very emotional and crying, and needed some time to gather herself and calm down.

12. On June 25, 2021, an FBI agent interviewed witness T.W., the first officer pilot of UA 5365, who stated, among other things, the following:

    a.  As UA 5365 began taxiing to the runway after pushing back from Gate 82, T.W. heard two or three knocks on the cockpit door followed by three or four loud bangs. Shortly

after T.W. heard the banging on the door, he heard a scream coming from flight attendant L.B.

      b.    T.W. believed that there was a direct threat to the cockpit. Captain J.S. set the brakes while T.W. declared an emergency over the radio with LAX Ground Control. T.W. notified LAX Ground Control that someone was trying to break into the cockpit and requested permission to return to the gate. The captain had a short "muffled" phone conversation with L.B. over the flight deck phone.

      c.    T.W. received taxiing instructions from LAX Ground Control to a parking location on an adjacent terminal ramp that was out of the way of other airport traffic. T.W. and J.S. began making a left turn towards the ramp when they received a caution message in the cockpit that a cabin door was open. T.W. looked out the cockpit window and noticed that the emergency evacuation slide was partially deployed at the front-right cabin door. Both T.W. and J.S. were concerned about the emergency evacuation slide getting ingested into the right engine, so they shut it down.

      d.    T.W. and J.S. got clearance from LAX Ground Control to go back to Gate 82. As they were maneuvering the aircraft back to the gate, they observed police cars surrounding VICTORIA DOMINGUEZ on the tarmac.

      e.    On the way back to Gate 82, J.S. called L.B. on the flight deck phone and received further information on what transpired in the cabin. L.B. stated that there were no further threats in the cabin and that the cabin was now secure. J.S.

and T.W. taxied the aircraft back to Gate 82 where law enforcement met them.

  **B.  Interview of VICTORIA DOMINGUEZ**

  13. After LAXPD detained VICTORIA DOMINGUEZ and transported him to a local hospital for treatment for his broken leg, the next day, on June 26, 2021, another task force officer ("TFO") and I interviewed VICTORIA DOMINGUEZ in the hospital. The TFO presented VICTORIA DOMINGUEZ with the Advice of Rights form, which was read out loud to him in Spanish. VICTORIA DOMINGUEZ stated he understood the form, signed it, and agreed to speak with us. He stated, among other things, the following:

    a. On Tuesday, June 22, 2021, VICTORIA DOMINGUEZ arrived at LAX from Los Cabos San Lucas, Mexico. His plan was to travel to Salt Lake City, Utah, but he did not have a connecting flight. He went to an unknown hotel on 7th Street in downtown Los Angeles near a bus station, where he drank several beers and purchased $20 of crystal methamphetamine from an unknown individual. When asked how much crystal methamphetamine he got for the $20, he responded, "A lot."

    b. The next day, Wednesday, June 23, 2021, VICTORIA DOMINGUEZ moved to another hotel on Central and 42nd in the downtown Los Angeles. He still had crystal methamphetamine and continued to smoke on and off throughout the day. He decided that instead of taking the bus to Salt Lake City, he was going to fly.

    c. On Thursday, June 24, 2021, at approximately 5:00 p.m., VICTORIA DOMINGUEZ left the hotel to go to LAX. Before he

10

left the hotel, he smoked more crystal methamphetamine. But, he ultimately missed his flight on Thursday, left LAX, and wandered the streets throughout the night.

       d.   On Friday, June 25, 2021, VICTORIA DOMINGUEZ returned to LAX. But, he missed the 12:00 p.m. flight and was rescheduled for a 6:30 p.m. flight (flight UA 5365).

       e.   VICTORIA-DOMINGUEZ boarded flight UA 5365 and took his seat. He was coming down from all the drugs he had used the last couple of days and immediately started to doze off. He heard the passengers seated behind him laughing and talking about the flight going to a different city than Salt Lake City.

       f.   VICTORIA DOMINGUEZ began to panic and immediately stood up and walked toward the front of the aircraft. He met flight attendant L.B. and told her he was not feeling well and needed to get off the aircraft. L.B. told VICTORIA DOMINGUEZ that the flight was about to take off and began to struggle with him.

       g.   Desperate to get off the plane, VICTORIA DOMINGUEZ approached and started knocking on the cockpit door so that the pilots would stop the aircraft and allow him to get off. When the pilots did not open the door, VICTORIA DOMINGUEZ walked to the emergency door located in the galley area to the right of the cockpit and opened it. VICTORIA DOMINGUEZ was familiar with how to open those doors because in the past he had sat in the emergency exit row and moved the handles up and down.

11

VICTORIA DOMINGUEZ further stated that perhaps his panic attack gave him the strength to open the door.

      h.    When VICTORIA DOMINGUEZ opened the door, the aircraft was not moving, but then it began to roll. At that point, he jumped off, landing on the ground. When he landed, he attempted to get up to move out of the aircraft's way and avoid being run over. He then realized he was unable to move due to his broken leg.

## CONCLUSION

    14.    For all the reasons described above, there is probable cause that VICTORIA DOMINGUEZ violated Title 49, United States Code, Section 46504 (Interference with Flight Crew Members and Attendants).

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this  27th  day of
June, 2021.

*R. A. Oliver*
UNITED STATES MAGISTRATE JUDGE